ORAL ARGUMENT NOT YET SCHEDULED

In the
# UNITED STATES COURT OF APPEALS
For the District of Columbia Circuit

―――――――――――――――

Appeal No. 24-5052

―――――――――――――――

CASSANDRA M.MENOKEN,

*Plaintiff-Appellant,*

*vs.*


CHARLOTTE A. BURROWS, CHAIR,
UNITED STATES EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION, *et al.*,

*Defendant-Appellees.*

―――――――――――――――――――――――――

*On Appeal from the United States District Court
for the District of Columbia in Case No.* 1:16-cv-02480-DLF
Honorable Dabney L. Friedrich
―――――――――――――――――――――――――

## BRIEF OF APPELLANT
## [CORRECTED]
―――――――――――――――――――――――――


*Submitted by:*

Cassandra M. Menoken, Esq.
131 Tennessee Avenue N.E.
Washington, D.C. 20002
(202) 546-7671
CMMEsqDC@gmail.com
*Pro se*

**CERTIFICATE AS TO PARTIES**
**RULINGS AND RELATED CASES**
**(REVISED)**

## I.     **Parties**

The Appellant, Cassandra M. Menoken, was the plaintiff in the district court proceeding. Charlotte A. Burrows (now former) Chair of the United States Equal Employment Opportunity Commission _and_ EEOC (collectively the "Government") were defendants in that proceeding.  The "Commission"-- EEOC's policy body -- _has never been -- and is not now -- a party to this action_. Despite efforts to suggest otherwise, neither the former Chair nor Government Counsel has the authority to "speak for" the Commission in this case.   No amicus curiae participated below.

## II.     **Rulings Under Review**

Menoken considers all adverse rulings -- and prejudicial _non_-rulings -- to be _presumptively_ in question given concerns (documented in and outside this record) calling into question the integrity and fairness of the district court proceeding. Menoken urges that the Court view all such rulings (and failures to rule) through the prism of these concerns and that the following specific Orders be <u>vacated</u>:

1. The February 2, 2023 Order on summary judgment [R. 52] A786;

2. The June 5, 2023 Order denying Clarification, Reconsideration and Judicial Notice; [R. 61] A927; and

3. The January 12, 2024 Order of dismissal under Fed. R. Civ. P. 41(b) [R. 116] A1195.

i

III.  **Related Cases**

A.  Cases Pending In Court

There are no cases pending in any other court involving the same parties and the same or similar issues, although this case was previously before *this* Court under Appeal No. 18-5284.  The decision is reported as *Menoken v. Dhillon*, 975 F.3d 1 (D.C. Cir. 2020). This appeal may require that the Court address issues debated below regarding the proper interpretation of the Court's 2020 Judgment.

B.  Cases Previously Before This Court

The parties apparently agree this case is related to the following cases *previously* before this Court: 1) *Menoken v. Berry* [1] (**Menoken I**);  2) *Menoken v. McGettigan* [2] (**Menoken II**); 3) *Menoken v. Weichert* [3] (**Menoken III**); and 4) *Menoken v. Kerner* [4] (the Kerner action). The rationale for designating these cases as related is explained in the "revised" related cases statement in the prior appeal which is included in the record before the Court in this appeal. [R 45-17] at A694. [5]

---

[1]  408 Fed. App'x 370 (D.C. Cir. 2010).
[2]  No. 17-5228, 2018 WL 2383278 (D.C. Cir. May 9, 2018).
[3]  No. 19-5319, 2020 WL 1487743 (D.C. Cir. Mar. 12, 2020).
[4]  741 F. App'x 817 (D.C. Cir. 2018).
[5]  Appellees do not explain why Menoken I-III are included in their case list. One can assume they want the Court to know of their stunning success. Menoken wishes the Court to know that a disturbing pattern of "anomalies" contributed to that success. *See* [R. 35-3] at A193-A196 (summary of Menoken I-III anomalies).

C.     A Case Previously Before The Federal Circuit

*Menoken v. Merit Sys. Prot. Bd*., previously before the Federal Circuit,[6] is

another case related to this case in that certain operative facts and events are *exactly*

the same.[7] The Federal Circuit matter involved a claim filed against EEOC after

Menoken learned that Robbie Dix (her supervisor) and Shelita Aldrich (OHR Branch

Chief) had secretly accessed her QuickTime account to *change* her pay codes for the

period covered by the government shutdown that was in effect from December 22,

2018 until January 28, 2019. [R 57-1] A879 (Declaration); *see also* A886 (Menoken

email). [8] Their goal in falsifying her leave records was to *block* Menoken from being

paid when the government reopened -- which is what happened -- resulting in a loss

of more than ten thousand dollars.  *Id.*

Menoken filed an appeal with the MSPB asserting that EEOC had effectively

suspended her without due process.  The appeal was dismissed on "jurisdictional"

grounds upon the Board's adoption of the *reframed* version of operative events

submitted by EEOC's OGC attorney, Anabia Hasan. *Compare* [R. 57-1] A857

(EEOC's Motion to Dismiss) and A878 (Response to Show Cause Order).  Notably,

when Menoken challenged the dismissal in a petition to the Federal Circuit,  EEOC

---

6      No. 2022-2301 (Fed. Cir. 2023).
7      *See generally* [R. 57] A849 (Motion for Order Taking Judicial Notice of
Record in Related Federal Circuit Proceeding).
8       Menoken email to Aldrich (copying Dix and others) stating: "*I am aware of no
legal or factual basis for placing me on LWOP for this period.*" (no response).

elected **not** to defend itself in the proceeding -- obviously concerned about the fact that it was litigating *the same malicious acts* in *this* case (under different liability theories).  One can only assume the Government's army of attorneys (at EEOC, DOJ, OPM *and* the Board) weighed the risks and decided it was best that the *Board* defend EEOC's malicious conduct in the circuit proceeding. The court affirmed the Board's jurisdictional dismissal of Menoken's due process appeal (as *reframed* by the Board -- on EEOC's behalf).

D.    Administrative EEO Complaints Awaiting Appellate Adjudication

The following pending administrative appeals are related to this case: EEOC Appeal Nos. 202300092; 202300093; and 202000345. Each involves claims of ongoing retaliation traceable to 2012, when Menoken criticized an attempt by Claudia Withers (EEOC's COO at the time) to use Menoken's desperate need for a reasonable accommodation as a "bargaining chip" to protect EEOC from legal exposure for its unethical adjudications of Menoken's OPM appeals. [R. 45-6] (Menoken Declaration) A663-A670 at A667 (para. 67).

> /s/ *Cassandra M. Menoken*  _____
> Cassandra M. Menoken, Esq.
> Appellant *pro se*

iv

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..................................................................vi

GLOSSARY OF ACRONYMS ........................................................ viii

STATEMENT OF JURISDICTION ...................................................1

STATEMENT OF ISSUES ...............................................................1

STATUTES AND REGULATIONS ..................................................1

STATEMENT OF THE CASE ..........................................................2

    RELEVANT BACKGROUND ...................................................4

    A.    Menoken's EEOC Employment ..........................................4

    B.    Menoken's OPM Litigation ................................................5

    Adjudicatory Corruption By EEOC Revealed in 2007.......................9

    C.    Menoken's Failed Effort to be Accommodated by EEOC ..................9

    D.    EEOC Forces Menoken To Retire ....................................10

    THE DISTRICT COURT PROCEEDING ..................................12

SUMMARY OF ARGUMENT...........................................................14

ARGUMENT .....................................................................................15

    I.    THE CITED GROUNDS FOR DISMISSING THIS ACTION ARE NOT SUPPORTED BY THE RECORD .................................15

    II.    THE CITED GROUNDS FOR DISMISSING THIS ACTION ARE INSUFFICIENT AS A MATTER OF LAW ...........................17

REQUESTED RELIEF .....................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Gardner v. United States*,
 211 F.3d 1305 (D.C. Cir. 2000) .................................................................15

*Menoken v. Berry*,
 408 Fed. App'x 370 (D.C. Cir. 2010) ...........................................................ii

*Menoken v. Dhillard*,
 975 F. 3d 1 (D.C. Cir 2020) ...................................................................ii, 12

*Menoken v. Kerner*,
 741 F. App'x 817 (D.C. Cir. 2018) ...............................................................ii

*Menoken v. McGettigan*,
 No. 17-5228, 2018 WL 2383278 (D.C. Cir. May 9, 2018)...........................ii

*Menoken v. Merit Sys. Prot. Bd*.
 No. 2022-2301 (Fed. Cir. 2023) ...................................................................iii

*Menoken v. Weichert*,
 No. 19-5319, 2020 WL 1487743 (D.C. Cir. Mar. 12, 2020) .........................ii

*Trakas v. Quality Brands, Inc*.,
 759 F.2d 185 (D.C. Cir. 1985) ...............................................................15, 17

**Statutes & Other Authorities:**

28 U.S.C. § 1291 .............................................................................................1

28 U.S.C. §1331 ..............................................................................................1

29 U.S.C. § 794(a) ..........................................................................................1

42 U.S.C. § 2000e-16(c)..................................................................................1

29 C.F.R.1614 § 404(a) ...............................................................................1, 7

29 C.F.R.1614 § 108 .......................................................................................5

29 C.F.R.1614 § 108(b)...................................................................................1

29 C.F.R.1614 § 108(c) ...................................................................................1

Fed. R. Civ. P. 33(4).....................................................................................13

Fed. R. Civ. P. 34(b)(2)(c)............................................................................13

Fed. R. Civ. P. 41(b)...............................................................................i, 1, 15

# GLOSSARY OF ACRONYMS

AJ...............................................................................................Administrative Judge

ALJ ................................................................................ Administrative Law Judge

COO …………………………………………………….Chief Operating Officer

HHS .....................................................Department of Health and Human Services

IBC …………………………………………………..Interior Business Center

MSPB or Board………………………………… Merit Systems Protection Board

OCHCO or OHR………………………..Office of Chief Human Capital Officer

OEO…………………………………………………Office of Equal Opportunity

OFO ..........................................................................Office of Federal Operations

OGC …………………………………………………….Office of General Counsel

OLC …………………………………………………Office of Legal Counsel

OPF ……………………………………………………Official Personnel Folder

OPM...................................................................Office of Personnel Management

QUICKTIME …………………………………………..EEOC's Payroll System

SSA.......................................................................... Social Security Administration

## STATEMENT OF JURISDICTION

This is an appeal from a final judgment in an action brought under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-16(c), and the Rehabilitation Act, 29 U.S.C. § 794(a). The district court had jurisdiction under 28 U.S.C. §1331. Judgment was entered on January 12, 2024.  The notice of appeal was filed on March 12, 2024. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.    Whether this Court must reverse the district court's dismissal of this action under Rule 41(b) because the cited grounds are unsupported by the record and insufficient as a matter of law; and

2.    Whether the district court's actions and rulings -- and abusive *failures* to act or rule at Menoken's behest -- so compromised the fairness of the proceeding as to require remand for assignment to a different judge with instructions to undertake such measures as may be warranted per the needs of fairness and  justice to rectify the prejudicial harm Menoken suffered below.

## STATUTES AND REGULATIONS

<u>Regulation</u>

29 C.F.R.1614 §404 (a):

On behalf of the Commission, the Office of Federal Operations shall review the complaint file and all written statements and briefs from either party. The Commission may supplement the record by an exchange of letters or memoranda, investigation, remand to the agency or other procedures

29 C.F.R.1614. §108 (b) and (c)

The investigation of complaints shall be conducted by the agency against which the complaint has been filed.

(b) In accordance with instructions contained in Commission Management Directives, the agency shall develop an impartial and appropriate factual record upon which to make findings on the claims raised by the written complaint. An appropriate factual record is one that allows a reasonable fact finder to draw conclusions as to whether discrimination occurred. Agencies may use an exchange of letters or memoranda, interrogatories, investigations, fact-finding conferences or any other fact-finding methods that efficiently and thoroughly address the matters at issue. Agencies are encouraged to incorporate alternative dispute resolution techniques into their investigative efforts in order to promote early resolution of complaints.

(c) The procedures in paragraphs (c) (1) through (3) of this section apply to the investigation of complaints:

(1) The complainant, the agency, and any employee of a Federal agency shall produce such documentary and testimonial evidence as the investigator deems necessary.

(2) Investigators are authorized to administer oaths. Statements of witnesses shall be made under oath or affirmation or, alternatively, by written statement under penalty of perjury.

<u>STATEMENT OF THE CASE</u>

Menoken is before this Court for the *sixth* time in 15 years still seeking relief and accountability -- this time, with respect to prejudicial conduct by the district court, and the usual misconduct of the Government attorneys representing EEOC. This appeal is the latest update on a painful journey that began in1994, when Menoken accused OPM of systemic race and sex discrimination for the way it had designed and managed the federal ALJ appointment process for 50 years.

What began as an effort to ensure equal opportunity for *all* qualified ALJ applicants has, over the years, morphed into a struggle for personal survival. Had Menoken known in 1994, what she knows now about the perils of challenging the Government on matters it deems important, this journey would have never begun.

2

There is a common thread that runs through all litigation arising from Menoken's original claims against OPM.  It suggests the Government is willing to litigate to the ends of the earth to avoid the seemingly insurmountable challenge of defending against Menoken's claims -- *as she defines them*.  EEOC's army of Government attorneys -- in DOJ, OPM and EEOC (with help, as needed, from the Board) -- seem committed to winning this case *by any means necessary* -- just not by following rules and telling the truth.

The district court litigation, this time, was exponentially more oppressive than ever before. The reason is that the judge did not preside as a neutral arbiter, but as a member of the Government's team.  It is against this backdrop that Menoken urges this Court to be mindful that a fair and just adjudication of this appeal requires unequivocal answers to the following questions:

1.    Whose narrative provides the proper context for analyzing the claims asserted in Menoken's complaint?  Menoken says hers.

2.    Whose "theory of liability" properly controls any analysis of the *merits* of Menoken's claims?  Again, Menoken says hers.

If this Court agrees that Menoken is the "master" of the action she brought almost 10 years ago, it must reverse the district court's dismissal and remand with instructions to allow the action to proceed, unencumbered by the Government's obsessive effort to tamp down the extraordinary story she has to tell.

<u>RELEVANT BACKGROUND</u>[1]

A.   <u>Menoken's EEOC Employment</u>

Cassandra Menoken is a former GS-15 Attorney who worked for EEOC in various capacities for more than 35 years. Her EEOC experience included (but was not limited to):

- Enforcement litigation as a trial attorney in the Office of General Counsel;
- Defensive litigation as a trial attorney in the Office of Legal Counsel;
- Supervisor in EEOC's (former) Office of Review and Appeals;
- Director of program that investigated "conflict of interest" EEO complaints
- Senior legal and policy advisor to the OFO Director; and
- Senior legal and policy advisor to former Commissioners William A. Webb (1982-1986) and Reginald E. Jones (1996-2000).

During her tenure Menoken was recognized, within and outside of EEOC, for her sustained commitment to excellence and unique insights into the laws enforced by EEOC.  Until 2012, she had been rated "outstanding" each year since 1982. However, *in* 2012, she was singled out to receive no rating at all. Indeed, her status as a valued employee began a downward spiral that year, after she sought a "workplace adjustment" to mitigate the health effects of  EEOC's decision, in 2001, to **conflate** its role as her *employer* with the role it unethically **chose** to assume as *adjudicator* of discrimination claims she had filed against OPM.

---

[1]    The recounted facts are drawn from the following sources: 1) Menoken's 2015 deposition [R.45-4] A409-A465;  2) Menoken's 2022 deposition [R. 47-1] A487-A660; 3) Menoken's 2018 OWCP Declaration [R45-6] A663-A670; and 4) the <u>Menoken I</u> Administrative Record.

B.     Menoken's OPM Litigation

Menoken filed an EEO complaint in 1994 challenging race and gender barriers in the federal ALJ appointment process (then) controlled by OPM.  At the time she sought to become an ALJ, more than 90 per cent of ALJs were white male. *All* women and *all* minorities *combined* made up *less* than 10 percent of federal ALJs. It had been that way (or worse) since **1946**.

When OPM failed to investigate her EEO complaint per the requirements of 29 C.F.R.1614. §108, Menoken exercised her right to request that EEOC arrange a hearing on her claims. After entertaining various objections by OPM to EEOC's "authority" to appoint a judge for the case, in 1997 EEOC appointed labor arbitrator, Ira Jaffe, to sit as a "designated" EEOC AJ tasked with overseeing discovery and presiding at a hearing on Menoken's claims.[2] It was at that point the process began its descent into chaos.

It soon became clear that OPM's strategy for defending Menoken's claims was to deprive her of any information that might facilitate her ability to prove the claims.[3] Both in discovery, and at the hearing, OPM repeatedly concealed or

---

[2]    EEOC determined an outside arrangement was appropriate because Menoken was well known in the agency.   Obviously, that was not a consideration when it came to processing her appeals, since they were handled by headquarters officials *with whom she directly worked*.

[3]    *See* [R. 11-1] (Corrected Opposition to Motion to Dismiss or for Summary Judgment) A77, [R. 10-1] (Exhibit A) A98 n. 3 (noting OPM's destruction and concealment of information and misrepresentations of material facts).

destroyed evidence and randomly *altered* documents in an effort to deceive. Judge Jaffe admitted being "troubled" by OPM's antics; but, chose not to hold OPM accountable -- preferring, instead, to allow Menoken whatever time she needed to "work around" any problems. His management of the case resulted in Menoken's claims being "stuck" at the hearing stage for several years.

After a lengthy hearing in March of 2000, Jaffe rejected *most* of Menoken's claims -- but not all.[4] He found OPM liable under Title VII for using an arbitrary scoring factor in the ALJ examination that correlated with race – to the detriment of otherwise qualified African American ALJ applicants. In an *interim* Order, issued November 9, 2000, Jaffe directed that OPM's "use" of the discriminatory scoring factor immediately "cease."

After entertaining briefing on relief issues, Jaffe issued a <u>Final</u> Order on June 29, 2001. In the Order, he directed OPM to correct the impact of the unlawful scoring factor on applicants who took the ALJ examination. Logic dictated that this was to be done *before* OPM allowed any agency to use examination scores to appoint ALJs. OPM could have appealed Jaffe's rulings, but did not -- promising to comply with his Orders -- then did not.

---

[4]   Jaffe did not acknowledge evidence showing that OPM's race-based scoring was not limited to one scoring factor. Nor did he acknowledge that the scoring factor he found unlawful was used in more than one part of the exam. And his "no liability" finding on the sex claim ignored OPM's *admission* that its "availability" policy operated as a barrier for qualified female ALJ applicants.

When all rulings became final, Menoken filed two appeals with EEOC; one

challenging Jaffe's unduly narrow liability ruling (the "merits" appeal); the other,

challenging his unexplained failure to address (or even *acknowledge*) the fact that

OPM had *violated the November 2000 "cease" order while relief issues were still*

*being litigated* (the "noncompliance" appeal).[5]  EEOC assigned both appeals to

Reuben Daniels, Director of EEOC's Charlotte Office, who coordinated with OCH,

OLC and OFO (as well as others) to arrange for their dismissal in 2003.

EEOC dismissed Menoken's merits appeal without reviewing the hearing record

(*aka* complaint file)[6] violating its own regulation at 29 C.F.R.1614.§404(a). EEOC

also dismissed the noncompliance appeal without requiring OPM to submit *evidence* of

its compliance in disregard of standard operating procedures.  While the Government

has made much of the Menoken I finding of "abundant admissible evidence" of OPM's

compliance -- [R. 42-1] at A262 --in fact, there was none  -- and OPM later **admitted**

it. *See* [R. 10-1] A97-A98 (Menoken Petition to Reopen OPM appeal); *see also* [R. 45-

3] A400 (re: testimony of OPM attorney Julie Ferguson Queen at SSA hearing).[7]

---

[5]    In May 2001, Jaffe had agreed to address OPM's violation of his November
2000 Order at a hearing. But he never scheduled a hearing. Indeed, he promptly
exited the case after his Final Order *never mentioning OPM's violation again*.

[6]    [R. 45-3] A400 (supplemental discovery response re: Brenda Borden).

[7]    OPM's violation of Jaffe's Orders gave rise to claims involving SSA and HHS
as "necessary parties" because OPM had allowed these agencies (and others) to
appoint ALJs for many more years on the basis of examination scores that were
racially "tainted."

*Adjudicatory Corruption Revealed in 2007*

Although it took years, Menoken eventually confirmed long held suspicions about the neutrality of EEOC's "adjudications" on her OPM appeals. The confirmation came, in or around 2007, when OPM produced a "privilege log" during discovery in the Menoken I court litigation. [R. 47] A681-A684. The log purported to justify OPM's "objection" to producing information about *ex parte* interactions with EEOC while Menoken's appeals were pending adjudication. Information in the log -- along with facts already known to Menoken through other means -- confirmed that *EEOC and OPM had been colluding since **at least** 2002* (and likely before) and that Menoken's appeals had been "fixed" *at the political level* in both agencies. [8] Not only had Menoken's appeals been corrupted by EEOC, but officials for --and with-- whom she worked had *participated in the corruption* (in concert with others). When Menoken realized the true extent to which she was working in an environment rife with corruption and dishonesty, it made her sick.

C.     Menoken's Failed Effort to be Reasonably Accommodated by EEOC

In early 2012, Menoken had a series of meetings with Claudia Withers, then EEOC COO, to discuss her pressing need to address the health effects associated

---

[8]     Notably, neither EEOC nor OPM has ever denied having *ex parte* interactions while Menoken's appeals were pending. Nor has EEOC or its DOJ Counsel ever denied that OPM attorney, Julie Ferguson Queen, has been actively participating in this litigation "behind the scenes."

with her position as Senior Legal Advisor in OFO.  Withers rejected every accommodation Menoken proposed *including* her **initial** request that EEOC arrange outside processing for (then) pending OPM appeals involving SSA and HHS. [R45-6] A663 at A666. All of Menoken's suggested accommodation were easily *doable* and would have effectively freed her of the debilitating daily burden of working directly with "colleagues" who had been -- or were still -- involved in adjudicating OPM related appeals.

Withers mysteriously abandoned accommodation discussions for several months, but then undertook to *resume* the discussions upon learning that Menoken had submitted a *formal* request for a reasonable accommodation on September 11, 2012.  After directing OHR to hold Menoken's request in abeyance (unbeknownst to her), Withers contacted Menoken in November 2012 to  propose the following: approval of *six months of paid leave* **on the condition** *that she sign a release waiving any claims arising from EEOC's corruption of her OPM appeals.* After six months, Menoken would be expected to return to her OFO position and resume working *under the same conditions that had caused her to need an accommodation in the first place*.

Menoken protested Withers' attempt to use her declining health as *leverage* to secure a legal windfall for EEOC. She also criticized her effort to use Menoken's need for an accommodation as some kind of "bargaining chip."  At that point, the

interactive process (such as it was) ended, whereupon, in 2013, Menoken took

extended leave (paid and unpaid).

D.    <u>EEOC Forces Menoken To Retire</u>

While she was on leave, Menoken's supervisor, Carlton Hadden, suddenly

stopped acting on her leave requests. He would neither grant nor deny them -- just

simply ignore them; something he had no authority to do.  Hadden also began

arranging for *other* employees to surreptitiously access Menoken's leave account

to *change* the codes she had entered. The discrepant coding caused "glitches" in

her account that eventually led to inaccuracies in her payroll records.

By 2014, Menoken had come to accept that her relationship with EEOC was

permanently broken and that, for health reasons, she needed to retire as soon as

possible.  However, she also knew she could not retire with errors in her payroll

records because that would set her up to be further abused by OPM.

When Menoken returned from leave in 2014, she arranged to work from

home and undertook to correct her records so she could retire in short order. But that

didn't happen.  She quickly realized it was not possible to correct her records on her

own, and no one in EEOC was willing to help her.  Initially, IBC Customer Service

made themselves available to assist in any way they could; but that would end in

2018 when EEOC instructed them not to talk to her.

Meanwhile, in 2015, Hadden arranged for Menoken to be supervised by Robbie Dix, someone he knew could be counted on to hasten her departure regardless of any concern regarding her leave records.[9] When his initial efforts failed to achieve the desired result, Dix shifted into "high gear" in 2018. In a span of just *four months* --in coordination with his headquarters collaborators -- he arranged to:

- *falsely* accuse Menoken of *avoiding* work to fabricate a basis for revoking her medically prescribed telework accommodation;
- *falsely* accuse her of *abusing* leave after directing her to *take* leave if she chose to follow her doctor's advice not to work in the office;
- *falsely* accuse her of being medically *incapable* of performing her job to fabricate a basis for proposing to remove her; and (like Hadden)
- *repeatedly* access Menoken's leave account to *change* her pay codes without her knowledge.

 Dix's "scorched earth" antics ultimately succeeded in forcing Menoken out; but the Government's bullying did not stop when she left.  Retaliation claims rooted in ongoing efforts to harm and intimidate her are included among the "cases" identified above as "related" and pending adjudication by EEOC.

---

[9]     EEOC went to extraordinary lengths to prevent Menoken from seeing the retirement package it would forward to OPM. Linda Dickens, OHR Benefits Specialist, actually *forged* Menoken's signature on a form in an effort to get the package to OPM without her review. [R. 45-6] (Declaration) A670 at ¶¶104 -107. It did not work because Menoken cancelled the retirement when she learned of the scheme. *Id.*  The Government similarly failed to produce her retirement package when it was requested in discovery.  [R. 45-2] at A353 (re: Doc. Req. No. 1).

## THE DISTRICT COURT PROCEEDING

This matter was before the district court on remand from the D.C. Circuit pursuant to a judgment reversing the court's 2018 dismissal. The Panel effectively ruled, in large part, that the court committed reversible error when it credited the factual narrative on which EEOC's motion to dismiss had been based. *Menoken v. Dhillard*, 975 F. 3d 1, 8 (D.C. Cir 2020). (rejecting arguments based on documents not referenced in the complaint and not representative of the interactive process in its entirety); *see also* D.C. Circuit Document. No. 1926554 [entered 12/13/21], Oral Arg. Tr. at 12-20 (Judge Millett's pointed challenge to AUSA Walker's palpable resistance to acknowledging (among other things) that his arguments could not be squared with the record -- or common sense).

The Circuit's mandate was issued on November 10, 2020; however, for reasons never explained, the case remained unassigned and dormant for over nine months -- causing Menoken to become suspicious. On August 12, 2021, she filed a *Motion for an Order Directing That An Answer Be Filed To Plaintiff's Amended Complaint* (hereafter the "Answer Motion")  [R. 28] A124. Although the Government responded to the Motion, it did not oppose it.  Yet, it would be 19 days before the case was reopened.

In an entry filed August 31, 2021, the parties received notice from the Clerk that Judge Dabney Friedrich had been "randomly" assigned. Within hours of the assignment, the Judge **denied** the Answer Motion, rejecting Menoken's suggestion that the circuit

likely wanted her complaint to be answered "as soon as possible," and citing a *footnote* in the circuit's opinion that she construed as giving her the option to *prioritize* allowing EEOC another opportunity to dismiss the complaint before having to answer it.  A6-A7 (Minute Order) (10/8/2021).  Although the Government chose not to accept the court's invitation to immediately seek dismissal again, the court's hostile message on how the litigation would unfold could not have been more clear.

By Order entered December 15, 2021, Judge Friedrich granted Menoken leave to file a Second Amended and Supplemental Complaint; but, not before requiring her to justify the Answer Motion she had filed four months earlier. *See id.* and [R. 35-1] A183. In a January 28, 2022 Scheduling Order the court set a discovery period of less than 90 days -- hardly sufficient for a case with the history this one has.  That history was recounted in Menoken's portion of the 2021 Meet and Confer report. [R. 41] at A249 (listing past discovery abuses by EEOC, OPM and DOJ).

Menoken was diligent in her effort to obtain relevant documents and information. *See* [R. 45-2] A341-A395 (discovery correspondence). But the effort was ultimately without effect, since the Government repeatedly raised "boilerplate" objections in violation of the rules. Fed. R. Civ. P. 33(4) (requiring "specificity" when objecting to interrogatories); Fed. R. Civ. P. 34(b)(2)(c) (requiring withheld documents to be identified). *See also* [R. 45-2] A353 (identifying "deficiencies" in EEOC's response to Menoken's First Document Request).  Given the court's compressed schedule -- and

13

cryptic concern over the "age" of this case -- it was not feasible for Menoken to try to "litigate" discovery abuses, since the court had shown no interest in holding the Government accountable for anything.

The record is replete with instances where the court was nonchalant about Government Counsel's abuses. There was no reaction, for example, when the court was apprised that AUSA Walker had surreptitiously *altered* Menoken's section of the parties' 2021 Meet and Confer report. A181 at n.3. There was similarly no reaction, in 2023, when the court was apprised that its analysis of Menoken's failure to accommodate claim was fatally flawed because it was based on "facts" EEOC *conceded* had been fabricated. *See* [R. 56, 58 and 60-1] A841, A895 and A908 (briefs on reconsideration) (re: Withers' many "settlement" offers in 2012). Although this list could continue for many pages, the point is that Menoken had no reason to believe a discovery motion -- or any other effort to achieve parity in the proceeding -- would have been fairly considered by the court.

## SUMMARY OF ARGUMENT

There is something fundamentally wrong when a court and a defending party join forces in an attempt to *bludgeon* a plaintiff into forfeiting her claims to facilitate the defending party's ability to mount a defense. That's what happened here. The district court was wrong to criticize and penalize Menoken for exercising her right to preserve issues for appeal and to push back when she felt the court had

14

gone too far.  Menoken had no obligation to accommodate the Government's
vague demand that she disavow her pretrial filings and somehow do *more* to
acknowledge that her claims had been "narrowed."

Any objective review of the evidence in this record (mostly undisputed)
would reveal that the problem with EEOC's ability to mount a "defense" has to do
with the fact that its conduct -- the last 25 years (and counting) -- is *indefensible*.

ARGUMENT

District courts have inherent and procedural authority to dismiss an action
for failure "to prosecute or to comply with [the Federal Rules] or a court order."
Fed. R. Civ. P. 41(b). However, that authority is not without its limits given the
policy preference for disposing of claims on the basis of their merit. It is well
settled in this Circuit that a court may enter such a dismissal *only* when clearly
warranted and '*only* after less dire alternatives have been explored without
success.'" *Gardner v. United States*, 211 F.3d 1305, 1308 (D.C. Cir. 2000) (quoting
*Trakas v. Quality Brands, Inc*., 759 F.2d 185, 187 (D.C. Cir. 1985)).

I.  THE  CITED GROUNDS FOR DISMISSAL<br>ARE NOT SUPPORTED BY THE RECORD

The Court is urged not to take, at face value, the summary assertions of
"disruption" and "prejudice" set forth in the dismissal decision. Such assertions are
hyperbolic and misleading -- and unsubstantiated in the record.  Indeed, the record
as a whole -- particularly in the days immediately preceding the dismissal-- reveals

15

that the court's dismissal had more to do with the judge's alliance with the Government than anything "extreme" or "unprofessional" that Menoken had done.

One might get the impression from reading the decision that the court had a passive role in the Government's motion to dismiss.[10] That impression, however, would be inaccurate. The content and timing of the filing were hashed on January 9, 2024 during an *ex parte* conference the court had with AUSA Dreier. A1139.

Menoken did not attend the January 9 conference,[11] but did read the transcript and was stunned that the court engaged substantively with Dreier on matters squarely disputed by the parties. Everything Dreier said was simply accepted as true. Not only did the court discuss the Government's forthcoming motion with Dreier,  the two also conferred about Menoken's exhibit list as one might do with counsel *on the same team.* A1147 ( Court: "**We** don't know if she's proffering every page [of a 54 page exhibit] or not...."). (Bold added).

The January 9 transcript reads like a therapy session where participants vent frustrations and provide support as they work through common problems. The

---

[10]   [R. 116] at A1196 ("Now before the court, unsurprisingly, is defendant's motion to dismiss…")

[11]   The conference was scheduled on less than 24 hours' notice.  The purpose was to admonish Menoken for objecting to the court's *sua sponte* show cause order directing her to produce to AUSA Dreier**,** Bates stamped copies of her trial exhibits **within three days**. [R. 108] A1127.  No corresponding order was directed to him.

problem, here, was that Menoken was unwilling to be coerced into accommodating the Government's plan to win yet again *without following rules or telling the truth*.

## II. DISMISSAL IN THIS CIRCUMSTANCE WAS UNWARRANTED AS A MATTER OF LAW

Even assuming Menoken had engaged in sanctionable conduct (which she did not), dismissal of this action with prejudice would still require reversal. There is no way -- on this record -- that it can be reasonably concluded that dismissing Menoken's claims without pursuing other options served the interest of justice.

Regardless of the rationale for imposing dismissal as a sanction, this Circuit requires that it be done *only* after less dire alternatives have been explored **without success**." *Trakas v. Quality Brands, Inc.,* 759 F.2d 185, 186–87 (D.C. Cir. 1985). The district court cited no factual basis for concluding that a lesser sanction would not have been successful.   That's because no lesser sanction had actually been tried -- or even *considered* in any meaningful way. The Court may, therefore, reverse the order of dismissal on this basis as well.

## REQUESTED RELIEF

For the foregoing reasons -- and in the interest of justice and fair play --- Menoken urges that the Court reinstate this action and vacate all adverse rulings by the district court as set forth in the rulings listed in the Notice of Appeal. [R. 118] A1205.  The Court is further urged to remand this case with instructions to

the District Court Clerk to *promptly* assign another judge to take such measures as may be needed to rectify the prejudicial harm Menoken suffered in the proceeding below.

Respectfully submitted,

/s/ *Cassandra M. Menoken*
Cassandra M. Menoken, Esq.
131 Tennessee Avenue N.E.
Washington, D.C. 20002
(202) 546-7671
CMMEsqDC@gmail.com
*Pro Se*

18

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

   [ X ] this brief contains [*3,895*] words.

   [    ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.      This brief document complies with the typeface and type style requirements because:

   [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 365*] in [*14pt Times New Roman*]; *or*

   [    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>March 3, 2025</u>                   <u>/s/ *Cassandra M. Menoken*</u>

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 3rd day of March 2025, I caused this Brief of Appellant to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

I further certify that I caused the required copies of the Brief of Appellant to be hand filed with the Clerk of the Court.

/s/ *Cassandra M. Menoken*